## RANKIN WINKFIELD V. THE STATE.

1. CONTINUANCE.—An application for continuance, made by one indicted for murder, which is based on the absence of a witness by whom defendant expected to prove that deceased had been seen in bed with defendant's wife, and that the fact had been communicated to the accused "a *short time* before the killing took place," is too vague with reference to time, and is insufficient.

2. CONTINUANCE.—Such evidence could only be material to reduce the offense from murder to manslaughter, by establishing "adequate cause," and the time which intervened between the communication of the fact to the defendant and the homicide should be definitely stated, and with such certainty as to enable the court to determine whether there had been reasonable time for passion to subside.

3. CHANGE OF VENUE.—After an application for change of venue has been made, under art. 2994 of Pas. Dig., on account of prejudice, the court may examine other witnesses for the purpose of determining the truth of the matters alleged in the application.

4. CHANGE OF VENUE.—The issue presented by an application for change of venue involves not only the general character for truth of those who make the supporting affidavits, but also their means of knowledge, their intelligence, and their relation to defendant. It may also embrace the notoriety of the particular offense of the party slain, or of the defendant himself, and an inquiry into the settled conviction of a large portion or the whole of a community, as to particular offenses or classes of persons.

5. CHANGE OF VENUE.—On application for change of venue based on alleged prejudice, the affidavits of credible witnesses who swear affirmatively are much more reliable and should have much more weight than those which are merely negative in their character.

APPEAL from Gonzales.    Tried below before the Hon. Henry Maney.

*A. S. Chevalier,* for appellant.

*George Clark, Attorney General,* for the State.

ROBERTS, CHIEF JUSTICE.—The defendant was indicted and convicted for murder in the first degree, and his punishment was fixed at hard labor in the penitentiary for life.

The facts, as exhibited in the evidence, were, that Rankin Winkfield and his wife, Venus, had been married for a number of years, but had not lived together for more than a year, and he had been at her house but twice during the year; that the deceased, Alfred Ray, was frequently at Venus' house; would come there sometimes late at night, and was quite intimate with her; she washed his clothes. One witness stated that a few days before the killing he heard defendant say, in speaking of the deceased, "that he would get away with him, if he did not mind." The defendant and his wife, Venus, the deceased, Alfred Ray, Ellen Harris, daughter of Venus, and another little daughter of Venus, and Sarah Phelps, all freedmen and freedwomen, had been picking cotton on the farm of Mr. Kindred on the day of the killing. On that evening Venus, her two daughters, and Sarah Phelps were traveling on the road to George McKean's place, some walking and some riding, when they were overtaken by deceased, Alfred Ray, on horseback, and upon the suggestion of Venus' daughter, (Ellen Harris,) those that were walking were taken up on the horses to ride. Venus got up behind Alfred Ray, who also took up before him her little daughter. Sarah Phelps got up behind Ellen Harris, and thus the party moved on about ten miles. George McKean and another freedman, Ben Hodges, were traveling along the same road, a short distance behind said party, with an ox-wagon, George McKean driving it, going from and to the

same places as the others, when the defendant rode up and asked Ben Hodges to give him a six-shooter of George Mc-Kean's that was in the wagon, which being handed to him, he rode off with it. By this time it was just after dark. The defendant rode up slowly along the road to the party first mentioned and shot Alfred Ray in the left side of the back, who fell off after riding a short distance, and said, "Folks lay me out, for I am hurt." Venus said to Rankin Winkfield, "What made you kill that man?" He replied, "Because you are my wife, and you have got that man following after you." He then rode off at a moderate pace along the road towards his home. Ben Hodges, who had handed defendant the pistol, heard the report of it, and coming up, found Ray wounded, the women remaining with him where he fell. Alfred Ray was carried to Mc-Kean's house, where he died from this wound in two days afterwards. It was examined by a physician and pronounced to be mortal, as it proved to be.

Such a state of facts might well justify a verdict for murder in the first degree, the killing being shown by the evidence to have been a deliberate act of revenge threatened beforehand.

The defendant, by his counsel, contends that the conviction is erroneous on three grounds, presented in his bill of exceptions taken upon the trial of the cause: 1st, in the court overruling the application for a continuance; 2d, in the court overruling the motion for a change of venue; and 3d, in the court overruling the motion for a new trial.

The defendant stated in his application for a continuance that he expected to prove by Margaret Deel and Fayette Waller that they had seen the deceased, Alfred Ray, in bed with his wife Venus, and that they had told him of that fact a "short time before the killing took place."

The object of this evidence was to reduce the offense to manslaughter, by establishing adequate cause, in the language of the code, "adultery of the person killed with the

wife of the person guilty of the homicide, provided the killing occur as soon as the fact of an illicit connection is discovered." (Pas. Dig., art. 2251.)

This presupposes that such a discovery would arouse a degree of passion, which for the time would dethrone reason and suddenly impel the person thus aroused to violence against the offender. Such passion so aroused, however, could be held to be adequate cause only until there had been reasonable time for such passion to subside. It would only be where it was made to appear that such cooling time had not elapsed that it would be available to mitigate the offense. The time, as well as the intervening circumstances between the discovery and the killing, become thereby most material to enable the court, in an application for a continuance, to determine the materiality of the desired evidence. The terms, "a short time before the killing," with none of the attendant circumstances stated, could convey no determinate idea of time to the court which would enable it to judge of whether there had or had not been reasonable cooling time between the discovery and the killing. The expression, "a short time," standing by itself, is relative, not definite, and not certain to a common intent. It may mean different periods, as used by different persons, or as used in reference to different subjects. It may, when thus used, mean ten minutes, one hour, one day, one week, or a month. Its elastic property may render its use in judicial proceedings, when time is a material matter, a cover for a false impression, where the detailed exposition of the attendant circumstances and intervening occurrences by which the time could be measured or the statement of the minutes, hours, or days, would not answer the purpose of the deception, whether designed or accidental.

From its general uncertainty, therefore, its use cannot be tolerated in a matter of this kind, where the time intervening between the discovery of the alleged fact and of the

killing enters into the very essence of the defense sought to be established by the witnesses.

We cannot hold that the court erred in overruling the application for a continuance on an application thus made.

The motion for the change of venue was made upon his own affidavit, supported by that of six others, to the effect that there existed in Gonzales county so great a prejudice against him that he could not obtain a fair and impartial trial in said cause. In opposition to this, quite a large number of persons testified that they lived in different portions of said county, where they were well acquainted, and that they never heard of any such prejudice, and believed that if it existed they would have heard of it; that such a prejudice might exist without their knowing it, but they thought it could not. One witness, Thomas H. Spooner, swore that since the killing had occurred he had registered the voters of that county; that he was satisfied there were one thousand jurors in the county who knew nothing about and never heard of this defendant; that over six or eight hundred of them lived west of the river, not more than six or eight of whom, as he supposed, ever heard of the defendant, and that he was satisfied he could obtain a fair trial. Another witness, James F. Miller, swore that he was well acquainted in the county, and never heard of such prejudice; that if it existed he thinks he would have known it; he thinks the defendant could obtain a fair trial, because there were eight hundred or a thousand jurors in the county who never heard of the defendant; that the deceased, Alfred Ray, was a freedman, but little known, whose killing created no excitement in the county; that he knew the parties who made the affidavit in support of defendant's motion; that they were ignorant freedmen, living in the extreme eastern portion of the county, and he was satisfied that their acquaintance in the county would not enable them to know the facts in regard to which they testified.

The Code of Criminal Procedure provides that "a change of venue may be granted on the written application of the defendant, supported by his own affidavit, and the affidavit of at least two credible persons, residents of the county where the prosecution is instituted, for either of the following causes," (one of which is the prejudice, as stated in this case,) "the truth and sufficiency of which the court shall determine." Under this provision the existence of the prejudice, so great that the defendant cannot get a fair and impartial trial in the county, is a fact, the truth of which the court must determine. If the witnesses are unknown to the judge, he could not know that they were such credible persons as the code requires, and to find that out he must institute an inquiry in some mode or other. The issue presented to him involves more than their general character for truth. It embraces their means of knowledge, their intelligence, and their relation to the defendant. It may also embrace the notoriety and character of the transaction, or of the party slain, or of the defendant himself. And it may also embrace the settled conviction of a large portion or the whole of the community as to particular offenses or classes of persons. Some or all of these matters entering into the issue, information upon them is often absolutely necessary to an intelligent decision, which is often a delicate and difficult duty to perform. The very existence of a strong and prevalent prejudice may sometimes be the means of showing, by the negative testimony of numerous witnesses, that it does not exist. On the other hand, the facility of procuring two or three persons to make the necessary affidavit, whose general character for veracity is not known, and therefore cannot be impeached, would work a great evil in the administration of the law if other matters than their credibility could not be inquired into. In all such cases affirmative evidence, such as that given by Thomas H. Spooner and James F. Miller, is much more reliable, and

should have much more weight, than negative evidence, as from its nature it must necessarily have.

In construing this provision of our code, we cannot say that the admission of counter affidavits, in trying the issue presented to the judge, is erroneous. It is simply a case where the highest qualities of the judge are called into requisition to stand forth as the fearless protector of the persecuted and oppressed prisoner on the one hand, or, on the other, with cautious scrutiny to prevent the evasion of the due execution of the law by a strongly-backed criminal.

We see nothing in this case to induce the belief that the court did not act correctly in determining the matter.

In a civil case, it was held not to be error in a judge to refuse to hear counter affidavits, and the opinion is expressed that they are inadmissible. (Salinas v. Stillman, 25 Tex., 16.) In a criminal case determined under the code, it was held that they were admissible, and the refusal of a judge to change the venue upon the strength of them was not error. (Cotton v. The State, 32 Tex., 637.)

In following that decision, it is not necessary now that we should adopt or sanction the view expressed that, in the performance of this duty, the District Judge acted under a personal and not under a legal discretion, conferred by the statute, which was not subject to revision in this court.

The motion for new trial was based partly upon the affidavit of counsel, in substance, that had he not deemed the affidavit sufficient, he was warranted, by the previous conversation with his client, to have stated in it that defendant "expected to prove, by Margaret Deel and Fayette Waller, that they saw deceased in bed with defendant's wife, and came and told defendant, and defendant said he immediately sought and killed deceased."

It may be answered that this still would not have disclosed the facts, the length of time, and circumstances which would have enabled the judge to determine the

materiality of their evidence, in connection with the facts developed on the trial. If they existed, it would have been easy to state them, and it could have been done after the trial without any danger of prejudice to the defendant, whatever might have been the policy for not developing them accurately in detail before the trial.

The defendant also made an affidavit in support of the motion for a new trial, in which, among other things, he stated that Margaret Deel was sick in child-bed, and could not possibly attend court as a witness for him. If it had been affirmatively shown that Margaret Deel was a material witness for him in a way to be appreciable by the presiding judge, still it was not shown when or from whom he ascertained this fact, whether or not he knew it before the trial, and if so, what excuse he had for not disclosing it in his application for continuance.

On the motion for new trial the whole matter was before the court, under the then increased opportunity of judging whether or not defendant had been fairly tried, without injury from any rulings made in the case. It is fair to presume that due weight was given to everything properly presented which could affect the real merits of the case.

There is nothing presented in the record that would enable a revising tribunal to determine that the defendant's conviction was erroneous, and therefore the judgment is affirmed.

AFFIRMED.