[No. 1892.]

C. C. DAVIS *v.* THE STATE.

1. PRACTICE — CHANGE OF VENUE — AFFIDAVIT.— One of the grounds upon which article 578 of the Code of Criminal Procedure authorizes the award to a defendant of a change of venue upon his filing his written application therefor, supported by his own affidavit and those of at least two credible persons, residents of the county where the prosecution is instituted, is that "there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial."

2. SAME — STATUTES CONSTRUED.— The award of a change of venue upon the application of a defendant may be contested by the State upon complying with the requirements of article 583 of the Code of Criminal Procedure, which provides as follows: "The credibility of the persons making affidavit for change of venue, or their means of knowledge, may be attacked by the affidavit of a credible person, and the issue thus formed shall be tried and determined by the judge, and the application granted or refused as the law and facts shall warrant." Properly construed, this article of the Code of Criminal Procedure requires that this controverting affidavit, subscribed by a credible person on behalf of the State, shall allege that the general reputation of the supporting affiants is bad, or that their means of knowledge are not sufficient to support and justify the statements contained in their affidavits.

3. SAME — BURDEN OF PROOF.— If the defendant's application for a change of venue complies with the requirements of the statute, and is not properly controverted when it comes on to be heard, no triable issue is raised, and he is entitled to the change of venue as a matter of right. A triable issue on such an application is raised only when the State has filed a contesting affidavit in compliance with article 583, *supra*, and, upon the trial of that issue, the burden of proof rests upon the applicant. See the opinion *in extenso* on the whole question.

4. SAME — CASE STATED.— The defendant in this case having filed his application for a change of venue, in strict conformity with the statute, the State, to contest the same, filed an answer, supported by the affidavits of eight persons, which formally denied the truth of the application, and averred

in substance that one of the subscribing witnesses thereto was a relative of the applicant, and another a tenant of the first affiant, and that the remaining affiants were residents of the southern portion of the county and were unacquainted with the sentiment of the mass of the people of the county. To this answer the defendant demurred, 1st, because it did not attack the credibility of either of the subscribing affiants; and, 2d, because it did not attack their means of knowledge. The court overruled the demurrer and the defendant excepted, his bill of exceptions presenting the sufficiency of the State's affidavit contesting the motion to change the venue. *Held* that, in failing to assail directly the credibility of the supporting affiants or their means of knowledge, the State's controverting affidavits were insufficient, and the court erred in overruling the defendant's demurrer; but that, in view of the fact, as disclosed by the trial judge's explanation to the bill of exceptions, that the affiants who subscribed to the application and several others were fully examined in open court by the defendant and the State as to the matters alleged in said application, and as to their means of knowledge, the error was not such as to prejudice any right of the accused, and is not, therefore, cause for reversal. See the opinion on the question.

5. Same — Jury Law.— The manner in which the examination of persons presented as jurors, as to their qualifications to serve as such, is a matter committed to the sound discretion of the trial court, and will not be revised by this court except in cases where an abuse of that discretion is made manifest. See the opinion in illustration.

6. Same — Evidence — Case Stated.— No statement made by a party while in jail or legal custody, whether for the offense for which he is on trial, or another, is competent evidence against him, unless it is legalized by due warning, or, being a statement of facts tending to establish his guilt, it is subsequently found to be true. In this case a State's witness was permitted to testify that he was informed of the incarceration of the defendant in the G. county jail upon a charge of theft, and that he repaired to the jail of that county to identify him as the defendant in this case; that he did identify him, pointed him out as the defendant, and called him by name, which the defendant disclaimed and claimed a different name. The testimony of this witness was objected to because the defendant was in jail at the time he disclaimed his proper and claimed a false name. *Held* that, though the evidence was improperly admitted, it was not of such character as to prejudice any legal right of the defendant, especially in view of other evidence which clearly established his identity as the person charged in the indictment under which he was upon trial; and, therefore, the error is not sufficient ground for reversal.

7. Same.— The State, having established the fact that, at the time of the homicide, and for a half hour prior thereto, the defendant was in the custody of the deceased upon a charge of misdemeanor, was permitted to prove certain remarks made by the defendant during that time, to the deceased and to others. To the competency of this evidence, the defense objected. *Held* that, the declarations being made prior to the homicide, they could not partake of the nature of confessions, and the objection is frivolous.

8. Same — Express Malice.— Charge of the Court is to be construed as a whole and not by subdivisions, and if, when so construed, it is found to present the law of the case clearly and correctly, it will be sustained. See the opinion for a charge upon express malice *held* sufficient when considered in connection with the whole context.

9. SAME — SELF-DEFENSE.— See the statement of the case for a charge of the
   court upon the law of self-defense *held* correct as applied to the evidence
   adduced.
10. MURDER — FACT CASE.— See the statement of the case for evidence *held* suf-
    ficient to support a conviction for murder of the first degree.

APPEAL from the District Court of Llano. Tried below before
the Hon. A. W. Moursund.

The indictment in this case, filed December 11, 1884, charged the
appellant with the murder of James B. O'Bannon, in Llano county,
Texas, on the 22d day of July, 1884. His trial resulted in his con-
viction of murder in the first degree, and his punishment was
assessed at a life term in the penitentiary.

R. H. Laning was the first witness for the State. He testified
that he was a justice of the peace in and for Llano county, Texas,
in July, 1884. The deceased occupied the position of deputy sheriff
of Llano county, at the time of his death, and during his incum-
bency of that office he lived in the jail building. The witness
occupied as an office a room in the two-story building on the north-
west corner of the public square in the town of Llano. The defend-
ant was arrested and brought before the witness, at his office, on the
17th day of July, 1884. The witness identified a book introduced
in evidence as his justice's court docket, and, over the objection
of the defense, read from it, on page 105, the entry in case number
440, as follows:

"No. 440. { THE STATE OF TEXAS
            {          *v.*
            {     C. C. DAVIS.

"Complaint filed the 7th day of July, 1884, by E. Lappe against
C. C. Davis, charged with serious threats on the life of E. Lappe
and Munnell. Warrant issued on the 8th day of July, 1884, and
placed in the hands of and to the sheriff of —— county. Subpoena
issued 8th day of July, 1884.

"Warrant returned executed July 17, 1884. And now comes the
defendant into court, and the State not being ready, he was required
to give bond in the sum of $500 to be and appear before this court
on the 19th day of July, 1884. Now comes the defendant in per-
son, and, the State not being ready, asks for a continuance. It is
ordered by the court that the defendant C. C. Davis's bond be re-
duced to $300 for his personal appearance before this court on the
22d day of July, 1884.

"July 22, 1884. The State announced ready for trial, and E. C.

Bonham appointed by the court to represent the State, and the defendant pleads not guilty by his attorney, E. L. Houghton. After hearing evidence pro and con., it is ordered by the court that the defendant C. C. Davis be bound over to appear before the grand jury on the 8th day of December, and his bond is fixed at $100 for his appearance before the grand jury, and that he be remanded to the custody of the sheriff. Said bond is given herein, under my hand, this 22d July, 1884.                    R. H. Laning, J. P."

Continuing his statement, the witness testified that the defendant, at the different times mentioned in the entry read, was in the custody of the deceased. The deceased brought the defendant from jail to the witness's office on the 22d day of July, 1884, and after the witness rendered his judgment binding the defendant over to the grand jury in the sum of $100, the defendant requested the deceased to go with him to see Mr. Will Wallace in order to get Wallace to sign his bond. The deceased agreed, and he and defendant started off together in an easterly direction about 3 o'clock in the afternoon. This was the last time the witness saw the deceased alive. He saw his dead body, between fifteen and thirty minutes afterwards, lying in the road, about one hundred yards from the court-house, and some forty-five or fifty feet south of the postoffice, which was kept in Mrs. Hart's house. Wallace lived southwest from the witness's office, and the body of the deceased lay on the direct route to Wallace's house. The head lay to the southwest. Three balls struck the body. One entered the right leg and ran down it. Another broke the deceased's neck from the right side, and the other entered the right side under the arm. Witness held the inquest over the body. A. J. Caruthers, Doctor Miller, and probably Doctor Brown, were present at the inquest, which was held about 4 o'clock. The witness did not see the defendant after he left his office with the deceased on the evening of July 22, 1884, until he was brought back to Llano county a month or two prior to this trial. Deceased had been dead but a short time when the witness reached his body. Witness found a pistol belt and scabbard on the deceased. Deceased had a pistol on when he left witness's office with the defendant. If the defendant was armed, witness did not know it.

Cross-examined, the witness testified that deceased did not have a patent pistol belt on that day, or, if he did, he did not have the "attachments" on it. Thirty or more people were about the body when the witness reached it. Witness saw a bullet hole in a barn some twenty-five feet from where the body lay, and about eight or

ten feet from the ground. Witness heard four shots. Defendant had been in jail from the 17th to the 22d of July. Deceased told the witness that the defendant had talked impudently to him, and that if he did not improve his conduct he would put him in the cage and "give him what the law allowed." Witness never heard the deceased call the defendant a son-of-a-b—h.

S. W. Ligon testified, for the State, that he knew Davis, the defendant, when he saw him. The deceased and the defendant came into the Parlor saloon together on the day of the killing. Defendant asked if witness had seen Will Wallace since dinner on that day. Witness replied that he had not, but that Wallace was at the saloon just before dinner. Defendant then invited the deceased to take a drink. Deceased declined, defendant drank alone, and the two then left the saloon, going east. Between 4 and 5 o'clock on that evening the witness heard some shooting in the vicinity of the postoffice, and afterwards saw the dead body of the deceased. Witness was very busy on that evening, and could not be at all accurate in his estimate as to the length of time which elapsed between the visit of the deceased and defendant to the saloon and the firing of the shots.

Cross-examined, the witness stated that he thought he heard the shots some two or three hours after deceased and defendant left the saloon. He did not know whether or not the defendant had been on trial before the justice of the peace before he came to the saloon inquiring for Wallace. Quite a number of men joined in the search for the defendant after the shooting. Witness was unable to say that all of them were armed. All that he noticed particularly had arms.

J. A. Swanson was the next witness for the State. He testified that, on the day of the homicide, he was in the office of the county clerk on the public square east from the Parlor saloon. Deceased and defendant passed the door of that office together, and, as they did so, the witness heard the deceased say to the defendant: "I want you to do what you can and all you can; but I want you to do it as soon as possible, because I am nearly sick and scarcely closed my eyes last night." This was the last that witness ever saw of the deceased alive. About thirty minutes later, while the witness was standing in the door of his brother's store, he heard four shots in the vicinity of the postoffice. First one shot was fired; then two in rapid succession, and the fourth after a short interval. Witness afterwards, on that evening, saw men gathered around a body in a lane, but did not see deceased's body to recognize it until next day. He next saw defendant about six weeks before this trial.

Cross-examined, the witness stated that when deceased and defendant passed the county clerk's office, they were going east. Witness did not go to the place of the shooting. He went with about twenty-five others out on the common in search of the defendant, after the shooting. That entire party, so far as the witness could observe, were armed, but witness heard no threats against defendant expressed by any one.

Billy Kuykendall was the next witness for the State. He testified that he saw the deceased and defendant together in the Star saloon on the north side of the street in Llano, about fifteen minutes before the former was killed. The defendant requested the witness to sign a bond which he was then trying to fill, proffering as security to execute to witness a deed to one hundred acres of land. Witness, after reflecting a minute, replied that it would be useless to execute a bond, as other warrants were out against defendant. At this juncture the deceased interposed the remark that the rangers had a warrant against the defendant for the theft of a horse. Deceased and defendant said that they were going to see Will Wallace, and left; after which the witness saw no more of them. Witness heard two shots in the direction of the postoffice that evening.

W. A. H. Miller was the next witness for the State. He testified that he saw the defendant for the first time on the evening of July 22, 1884. He and deceased passed the witness's office between 4 and 5 o'clock on that evening, going thence in a westerly direction. Witness's office was situated on the south side of the square. Just before this the witness saw the deceased and the defendant on the square near the jail, going towards the printing office. Deceased had his pistol on his person, in a half-scabbard. Some little time after the parties passed the witness's office, the witness heard four reports of a pistol; the second and third shot were fired in rapid succession. He afterwards saw the body of the deceased lying in the middle of the narrow street which runs east and west between the postoffice and Mrs. Miller's residence. It (the body) lay some thirty, thirty-five or forty feet southwest from the postoffice window, between which two points there was nothing to obstruct the view. Two or three gentlemen reached the body in advance of the witness. Witness saw the body before he reached it. It lay flat on the back, arms extended, the palms of the hands up, head to the south and feet north. One of the pistol balls entered the right side of the deceased under the arm pit, and seemed to range straight in. Another struck the left leg just above the knee, and ranged downward and passed out just above the ankle on the inside. The third ball struck the left side of the neck. Witness was present for a

while during the examination of the body. No pistol or other firearm was found about the body. Witness saw the chin move just after he reached the body, and thought at the time that the nerves or muscles were then undergoing the process of relaxation. The wounds were still bleeding. Witness had known the deceased since August, 1879. He was a man of perhaps thirty-seven years of age, weighed about two hundred and twenty pounds, and had more than average strength. Witness could not tell the relative strength of the deceased and the defendant. The deceased, however, was the larger man of the two. He was acting as deputy sheriff of Llano county, Texas, when killed. Deceased, on the day of his death, wore his pistol in a half-scabbard on the right side, the handle curving backwards. The witness saw two hats on the ground near the body; one of which was deceased's.

Cross-examined, the witness testified that his office fronted north, and had a door and window in both the north and south ends. The witness thought that the defendant was the man who passed the witness's office with the deceased just before the shooting. Witness did not recollect what he was doing at that time. Witness had no previous acquaintance with the defendant. Deceased had his pistol on when he and defendant passed the witness's office. He wore it on his right side, the handle projecting somewhat behind. Defendant was then walking a few feet behind the deceased.

Will Lawrence was the next witness for the State. He testified he last saw the deceased in life standing in front of the *Rural* printing office, which was located on the southwest corner of the public square in the town of Llano. A man whom the witness believes to have been the defendant was with the deceased. They remained in front of the *Rural* office but a short time, and left together, going around the corner in a southwest direction. Within the next fifteen minutes the witness saw the deceased lying dead in the road, some ten or fifteen steps from the postoffice. The witness heard three or four pistol shots, which, according to the sound, were fired about where the body was found, some fifteen minutes after the parties left the neighborhood of the *Rural* office. The body lay about seventy-five yards from that office, and witness went to it immediately on hearing the shots. Witness noticed the wound in the neck which passed through the shirt-collar band, but looked for no other wounds. The defendant was not at or near the body when the witness reached it, nor did witness see him again until he was placed in jail by the sheriff, about two months prior to this trial. One or two persons, including Doctor Miller, were at the body when

the witness reached it. No arms were found at the body. Deceased had a pistol, wearing it in a scabbard suspended from a belt, on the right side, when he left the neighborhood of the *Rural* office. Defendant was then unarmed. The belt and scabbard were on the body, the latter being pulled up on the stomach. Deceased gasped once after witness reached the body.

Cross-examined, the witness testified that ·it was about 3 or half-past 3 o'clock in the evening when he saw the defendant and the deceased in front of the *Rural* office. He did not remember to whom, if to anybody, they were then talking. On leaving that point the deceased walked in advance of the defendant. The witness did not at that time take any special notice of the defendant. Doctor Miller and some other person reached the body about the same time that the witness did. The body, when the witness reached it, lay crosswise of the street, head west, towards and ten or twelve feet from the stable, and between the stable and the post-office; the side of the body being towards the postoffice. Witness was not absolutely certain that the defendant on trial was the man he saw with the deceased in front of the *Rural* office, and did not know who did the shooting. If the witness had seen the defendant on the street before his return in the custody of the sheriff, he would not have recognized him as the man he saw with the deceased in front of the *Rural* office on the day of the killing. Witness saw a straw hat on the ground near the body.

. A. J. Caruthers was the next witness for the State. He testified that he was engaged in the publication of a newspaper in the town of Llano, his office being on the southwest corner of the square. He last saw the deceased standing in the door of his, witness's, office with the defendant, a short time before his death. Witness saw the two men as they came to that point. Deceased had a pistol buckled around his body. When the parties left the witness's office door, they went around the corner in a southwest direction towards the postoffice. Within ten minutes after they left, the witness heard three pistol or gun shots from the direction in which they had gone, and within two minutes, having repaired to the point, he saw the dead body of the deceased lying angling across the road between the postoffice and Doctor Miller's stable. · The deceased was shot through the neck, the side and the leg. No fire-arms were found about the body. The witness next saw the defendant about six weeks prior to this trial, in the Llano county jail. The body of the deceased lay on the road which led from the witness's office to Will Wallace's house, which house was about three hundred yards distant

from the witness's office. No one was at the body when the witness first got in sight of it. He saw Will Lawrence when he reached the body, and was of impression that he was the first to reach it. Doctor Miller went to the body near about the same time, and made some kind of an examination of it. The shots which the witness heard were followed by two screams. He left his office and ran to the body immediately. Deceased gasped once after the witness reached him. The deceased's hat and that of the defendant lay near, and northwest of the body.

Cross-examined, the witness testified that the defendant's hat was of light or white colored wool or felt. He did not remember the color of his coat or pants. He noticed the defendant's face and hat while he was at the printing office door, but could not remember the color of his eyes. The deceased's hat was of straw. The defendant's hat was lying some six or eight feet from the deceased's feet, and further from his head. Deceased's hat was lying nearer his head than his feet. The two hats were some six or eight feet apart, a little west of a direct line from the postoffice to the body. Witness had never seen the defendant before the day of the killing, and could not say that, if he had subsequently met him casually on the street, he would have been able to recognize him as the man he saw with the deceased. There was a picket fence some three and a half or four feet high near the body, and a small tree stood some ten or twelve feet from the fence, but it did not obstruct the view from the postoffice to the point where the body lay. There was a slight wash in the street where the body lay. The witness thought that a man could easily place a hand on the picket fence spoken of and jump over it.

Cross-examined, the witness testified that the postoffice floor was raised some two and a half feet from the ground. Between the window on the south side of the postoffice and the point where the body lay, there was no obstruction whatever, and a person could stand in that window and plainly see everything at the point where the body lay. The body lay about forty feet southwest from the postoffice window. The picket fence stood about fifteen feet from the body, towards the postoffice, but was no obstruction to the view from the window, even if the object to be observed lay prone on the ground.

R. H. Lansing, recalled by the State, testified that he identified one of the hats found at the body as the hat worn by the defendant not exceeding thirty minutes before the shooting. The hat in evidence was the identical hat worn by the defendant when he left the

witness's office with the deceased, and was the same hat that was found lying on the ground a little west of the body. It had been in the possession of the witness since the inquest over the body of the deceased. The other hat in evidence was the same hat that the deceased wore when he left the witness's office with the defendant, and which was found after the killing, near the body. An indentation on the crown of that hat looks as though it had been made by a blow.

W. T. Dalrymple testified, for the State, that he last saw the deceased alive in Justice Laning's office, a few minutes before his death, on July 22, 1884. Deceased and the defendant left Laning's office together not exceeding thirty minutes before the dead body was found. When they left the office the defendant was in the custody of the deceased. Witness heard a conversation between the deceased and the defendant, which transpired in Laning's office. Defendant was required by the justice to give an appearance bond, and the deceased proffered to go with him in search of sureties. Defendant said that he thought he could make bond. Witness saw no more of the deceased alive after he left the office, and no more of the defendant until after his recent capture. The deceased, who was a right-handed man, had his six-shooter fastened to his right side, the handle curving backwards and a little behind. The scabbard in which he carried his pistol was short enough to disclose the cylinder of the pistol and render its removal easy. Deceased was a very stout, muscular man. Witness heard three or four shots a few minutes after the parties left Laning's office, and saw an excited crowd of people gathering about the point where, a few minutes later, he saw the body of the deceased. It lay in the road, on the most direct route between witness's office and the residence of Will Wallace. The pistol belt and scabbard were on the body when the witness reached it, but the pistol was gone. Two hats lay near the body. One was the hat worn by the deceased, and the other the hat worn by the defendant when they left Laning's office. As he left the justice's office the defendant said that he had a hundred acres of land on which he would give a lien to any one as indemnity for signing his bond.

E. L. Houghton testified, for the State, that he first formed the acquaintance of the defendant on July 17 or 18, 1884. He last saw the deceased alive a few minutes before he was killed, when the defendant was on trial before Justice Laning, sitting as an examining magistrate. The trial resulted in the justice binding the defendant over to appear before the grand jury. The examination

was had about 2 o'clock in the evening. Witness was one of defendant's counsel in that proceeding. When the decision of the court was announced, defendant said that he thought he could make the bond required, and the deceased proffered to take him to see any one he might name, and the two left together, ostensibly to arrange the matter. Witness saw them pass his office, going in the direction of the point where the body was found a few minutes later. Witness heard three reports of a pistol at or about that place. He was tardy in reaching the body, and found a large crowd already assembled. Witness identified one of the hats in evidence as the hat worn by the defendant when he left Laning's office. The deceased was a much larger man than the defendant, and was very muscular and active.

E. C. Bonham testified, for the State, that he last saw the deceased alive in company with the defendant in front of the *Rural* printing office, a few minutes before deceased's death. When he and defendant left that point they went in the direction of the postoffice. The deceased, in going off, walked to the left and a little in front of the defendant. He then had his pistol in a scabbard on his right side, quartering back. Witness was acting as county attorney at that time. He heard four shots in the vicinity of the postoffice within ten minutes after the deceased and the defendant left the *Rural* office, going in that direction. Immediately after these shots were fired he heard a voice, which he recognized as that of Mr. Swanson, call out that a man was killed. He ran to the place and found the dead body of the deceased. The defendant was nowhere visible, and the witness did not see him again until he was jailed a few weeks before this trial. The body of the deceased lay in the street on the direct route from town to Wallace's house. Witness identified one of the hats found near the dead body as the hat worn by the defendant a few minutes before the killing. The body lay about forty feet from the postoffice, and in plain view of the postoffice window. The picket fence which inclosed the postoffice was no obstruction whatever. Not more than thirty minutes had elapsed since the deceased and the defendant left Laning's office when the witness saw the body.

Cross-examined, the witness testified that two or three persons reached the body before he did. The belt and scabbard were still on the body; the latter being drawn around in front of where the deceased usually wore it. Witness had no recollection of seeing a handkerchief on the ground near the body.

Mrs. Wallace was the next witness for the State. She lived in

the town of Llano on the 22d day of July, 1884. She knew the defendant, but had no acquaintance with the deceased in his life-time, though she knew him when she saw him. The deceased and the defendant came to the witness's house about 4 o'clock on the evening of July 22, 1884. The deceased asked the witness where her husband could be found, and the defendant stepped to the water bucket and got a drink. The two shortly left the witness's house together, going in the direction of the postoffice, the defendant walking on the right of the deceased. They turned a corner on the way to the postoffice, and passed beyond the sight of the witness. Witness heard pistol or gun shots in the vicinity of the postoffice after the men had been gone from her house about long enough to reach the postoffice. Two or three minutes after the last shot was fired, the witness saw the defendant running in a south direction. He was bare-headed, and had a pistol in his hand. When he first appeared at the house in company with the deceased, the defendant appeared greatly excited and much embarrassed. Mrs. Newt. Nance was visiting witness that day, and was present with the witness when the two men came to the house together, and was standing with the witness when the defendant, after the shooting, passed south, in flight. The defendant had on a hat but no pistol when he and deceased were at the witness's house. Since she saw the defendant in flight, armed with a pistol and bare-headed, the witness had not seen him until she saw him in court upon this trial. Witness's husband's name was W. C. Wallace, but he was commonly known as Will Wallace. Wallace was in town when deceased and defendant called for him at the house.

Mrs. T. N. Nance testified, for the State, that she was visiting Mrs. Will Wallace on the evening of July 22, 1884, and was present with her when the defendant and the deceased came to Wallace's house on that afternoon. She saw the parties leave the house together and go off towards town. Shortly after they turned the corner towards the postoffice, the witness heard as many as four shots, fired, according to sound, in the immediate vicinity of the postoffice. A very short time after the last shot was fired, the witness saw the man who had just left Wallace's with the deceased, running towards Doctor Brown's pasture. He was bare-headed and had a pistol in his hand. He was running as long as the witness could see him. Witness had no doubt in her own mind that the man she saw in flight was the man who had been to Wallace's but a few minutes before with the deceased, though she declined to positively identify the defendant. The witness could not identify

the hat worn by the defendant on the occasion of his call at Wallace's house. Witness thought that, but for the excitement at the time when the man passed Wallace's in flight, she could have determined positively whether or not he was the same man who left Wallace's with deceased a few minutes before. She could not now identify the defendant as the man who called at Wallace's with deceased. She had never seen that man before.that call.

Mrs. Hart testified, for the State, that she was postmistress in the town of Llano. She was in her office on the evening of July 22, 1884, when the deceased and the defendant passed that office, going west. She saw them and heard them talking about a bond. Within the next ten or fifteen minutes she heard a shot fired, and asked who was shooting. She presently heard a second shot and went to the widow, on looking out of which she saw two men struggling on the ground. These two men she recognized as the deceased and the defendant, whom she saw a few minutes before pass the office going west. The deceased was on top of the defendant, and the defendant had the pistol. The witness saw the pistol in the defendant's hand, and saw him fire the third shot. At that time the defendant had nearly secured the topmost position. Presently he crawled out from under the deceased and fired the fourth shot, and deceased fell over and died without a struggle. The defendant then sprang up and ran off, bare-headed, with the pistol in his hand. Witness could plainly see the parties during the struggle. The picket fence was too near the office window, and the parties too far from the fence, for the fence to obstruct the view. Defendant did not look back in his flight, so long as the witness could see him.

Cross-examined, the witness stated that there was nothing in the deceased's hand that she could see during the scuffle. The defendant, while scuffling with the deceased, had the pistol in his right hand. The feet of the two men during the struggle ranged backwards towards the witness. She did not notice the direction in which the pistol was pointed. None of the balls struck witness's house. Witness saw the defendant fire the third and fourth shots.

Doctor J. H. Miller testified, for the State, that he saw the dead body of the deceased on the 22d day of July, 1884, between his office and the postoffice. It lay about sixty feet southeast from witness's office. Witness heard four shots at the point where the body lay, a few moments before he saw the body. The witness started to the body immediately after the last shot was fired. He examined the body and found the wounds described by previous witnesses. The

deceased gasped twice very feebly after the witness reached him. Deceased died from the effects of his wounds. Witness was the first person to reach the body. The deceased's belt and scabbard were on his body, but his pistol was gone. The shot in the neck was such an one as would ordinarily cause instant death.

Ben Ligon was the next witness for the State. He testified that he saw the deceased and the defendant together some time on the afternoon of July 22, 1884. He next saw the defendant at Sherman, in the Grayson county jail. The witness had a conversation with the defendant in that jail, at that time. He had not yet been arrested on the charge of this murder. Witness pointed him out and called him C. C. Davis. He replied that his name was Thomas Simpson and not Davis. This occurred on the 18th day of April, 1885. Witness, with others, made search for the defendant after the killing of the deceased, but failed to find him; nor did he see him again until he saw him in the jail in Sherman in April, 1885.

Cross-examined, the witness testified that he heard no one of those engaged in the pursuit of defendant after the killing of the deceased threaten to lynch him if caught. He heard one man express fears of the sequel if defendant was caught. Witness, having heard that the sheriff of Grayson county had a man in custody who was supposed to be the defendant, wrote to that sheriff on behalf of Sheriff Beeson to send a photograph, and afterwards telegraphed from Lampasas to the said sheriff to hold the man until they could arrive. Witness and Sheriff Beeson went to Sherman together, identified and secured the defendant.

Deputy County and District Clerk Hargis was next sworn for the State. He produced the record book of appointments, etc., and read the appointment, oath and bond of the deceased as deputy sheriff of Llano county. The State closed.

Doctor Stark was the first witness for the defense. He testified that he had examined the defendant's head and found a wound on it one and a half inches long. He found a rent in the hat in evidence corresponding with that wound. Witness could not tell what made either the wound or the rent. The instrument used, however, was not a very sharp one. Witness had practiced medicine eighteen years.

Cross-examined, the witness testified that he had no diploma as a surgeon. He had a certificate, but not from a faculty or institute. The scar of a wound, when healed, will not be nearly so large as the original wound. It was the recollection of the witness that the wound on the defendant's head was on the left side. Witness did

not know how defendant generally wore his hat, but knew that if the hat was set in a natural position on his head the rent in it would correspond with the scar.

G. W. Holden was the next witness for the defense. He testified that he was standing near Doctor Miller's stable when the deceased was killed. He heard the four shots fired, and heard the whistle of the first ball as it passed him and struck the stable. It struck the stable about seven feet from the ground, and passed out of the opposite side of the stable some eight or nine feet from the ground. A string extended from the bullet hole in the rear of the stable and through that in front, and carried out into the street, would strike a man about vest high. At seven steps it would strike a man a foot above the vest pocket. The ball described was shot from the north towards the south. The witness saw the body of the deceased after the shooting. It lay in the middle of the street in a kind of wash-out. Witness could see no sign of a scuffle on the ground. Witness lay down on the ground to test the view between the point where the body lay and the postoffice window. It was an easy matter to see through the spaces between the pickets, but witness could not say whether or not the window could be seen over the fence from that point. Witness was not the first, but was among the first, of the people to reach the body. As he approached the body he saw a bare-headed man with a pistol in his hands running past Wallace's house.

A. J. Caruthers testified, for the defense, that he measured the distance, by stepping it, between the point where the body lay and the stable. That distance was just seven steps. The straw hat lay five steps from the body and on higher ground, and about eight steps from the stable. The body lay northeast from the bullet hole in the stable. Witness aided in making the string-test through the bullet holes in the stable. The range indicated by that string was nearer on a line from the hat to the bullet hole in the stable than from the body to the hole. The point where the hat was found, as pointed out by Captain Brown, was about one foot east from the line of the string. The ground gave some indications of a struggle. The point where the body lay was seven or eight feet west of the line indicated by the string. Witness did not think that a blow on the crown of the head would knock a man's hat off.

W. A. Yett testified, for the defense, that during the defendant's incarceration in jail he heard the deceased say: "I reckon I have one of the sorest-headed chronic sons-of-b—hs ever seen. His name is C. C. Davis, and I could make a shooting block out of him."

Two or three days later, deceased, in the hearing of the witness, made substantially the same remark. He made the remark the last time in the office of Dalrymple & Houghton. Witness thought that some one present said something to deceased about the remark. He did not know whether or not deceased knew that he, witness, was related to defendant. The witness and the father of the defendant were first cousins. Witness had not seen the defendant prior to his arrival in Llano, since he was a very small boy. Witness, since the statement of the deceased in the office of Dalrymple & Houghton, had spoken to them about it. Houghton, the witness thought, said, "Yes," or at least something to indicate that he heard and remembered the remark of the deceased. He did not recollect what Dalrymple said.

R. F. Holden testified, for the defense, that he was among the first persons to reach the body of the deceased after the shooting. The parties present appeared to be considerably excited. He saw several of them preparing to follow in pursuit, and saw a number start off after the man who was supposed to have killed the deceased. The ground plainly showed evidences of a struggle.

C. C. Smythe testified, for the defense, that he was a prisoner in the Llano county jail during the period of defendant's incarceration prior to the killing of the deceased. During that time he heard a dispute between deceased and defendant, and heard the deceased, upon defendant complaining of insufficient food, tell the defendant that he would put him in a cell alone, on bread and water, if he heard any more such talk; that if that would not do, he would buck and gag him, and that if bucking and gagging was insufficient, he would shoot a light-hole through him. He also told the defendant that if he, defendant, wanted to "crawl" him, deceased, when he got out of jail, he would be offered the opportunity.

Cross-examined, the witness testified that, during the dispute spoken of, the deceased told the defendant that he was in a poor place to be complaining; that if he did not like the fare, his best plan was to make bond and secure his release. Witness, defendant and another man were in the cage at that time. Two other men were in the corridor. This all occurred on July 19, 1884. Defendant, who owed the witness fifty cents, paid the witness as he went to the examining court on July 22d, saying that he expected to beat the case, and would not come back to the jail. On the day before the examining trial was had, the defendant said that it was hard that he had to lay in jail; that he had heard that papers for his arrest for horse stealing in Blanco county were in the hands of the rangers, but that

he did not believe it; that he did not so much care for the reflection his arrest cast upon himself, but that he disliked very much the odor of disgrace, because of his mother and sisters. On the 24th day of July, 1884, the witness saw the following words written on the jail wall: "C. C. Davis is dead. July 22, 1884." Witness did not know who wrote those words on the jail wall. The conversation about the trial, and the payment to witness of the fifty cents by the defendant, occurred in jail about one hour before the defendant was taken to the examining court. Witness thought he had told some parties about that conversation, and thought he had said more to one man than he had detailed on the stand. He was, however, talking then, whereas he was now under oath. He had no particular reason for making a statement out of court different to the one he made in court. He talked out of court, just to be talking. Defendant had never said anything more in regard to the deceased, his arrest, and his case in the examining court, in the presence of the witness than the witness has testified to. Witness told John Oatman, on the day after the killing of deceased, that the deceased had uniformly treated the prisoners well, and that he had never seen a more considerate jailer. Witness made this remark for the purpose of enlisting sympathy in his own behalf. The excitement incident to the killing disclosed the fact that the deceased had many friends in the community, and the witness sought by his declaration to Oatman to benefit himself. Mrs. O'Bannon usually attended her husband when he fed the prisoners. Witness did not remember whether or not she was present when deceased and defendant had the dispute. The defense closed.

Mrs. H. C. Harred was called for the State in rebuttal. She testified that she had known the defendant since 1861. He has had a scar on the left side of his forehead since his early childhood. His mother pointed that scar out to the witness nineteen years ago.

Cross-examined, the witness said that she had not discussed this case to any one prior to her arrival at the court-house on the morning she testified, when she talked about it with the district attorney. She did not know what the State expected to prove by her until she arrived at the court-house. Witness knew the defendant on trial to be the same person she knew in his childhood in Burnet county, Texas, and knew that he then had the scar that he has now over the left eye.

W. P. O'Kelley testified, for the State, in rebuttal, that he first saw the defendant in 1884, when he and the defendant were working together on the court-house. One day the two went to the well

to get a drink of water. The defendant sat down on the curbing to rest a minute or two, and as he did so he took off his hat and roached his hair with his hand. As he roached his hair the witness saw a scar on the top of his head on the left side. Witness related this fact to a crowd at McInnis's store a short time after O'Bannon was killed. Witness had not discussed that scar since with any one, and did not know, until he reached court, what was expected to be proved by him. He first told Mr. Dalrymple, of counsel for the State, what he knew about the scar, just before taking the stand.

Mrs. O'Bannon, the widow of the deceased, testified for the State, in rebuttal, that at the time of the homicide the family of the deceased occupied the lower apartments of the Llano county jail. Witness generally went with the deceased to feed the prisoners, and did so, except on two occasions, during the period of defendant's incarceration prior to the homicide. On one morning, when the witness went with deceased to feed the prisoners, defendant grumbled because he was not given beef for breakfast. Deceased replied that he could not afford to feed them beef for breakfast. Defendant cursed the deceased. Deceased told him to hush up; that he could not resent his oaths while he had him in custody. Deceased fed the prisoners well, and, in the opinion of the witness, was entirely too lenient with them.

W. A. H. Miller and R. A. McInnis testified, for the State, that the palm of the deceased's right hand, when they saw it shortly after the killing, appeared to be powder-burned.

The court's charge upon the law of self-defense, referred to in the ninth head-note of this report, reads as follows:

"Every person is permitted by law to defend himself against any unlawful attack injuring, or reasonably threatening injury to his person, and is justified in using the necessary and reasonable force to accomplish it, but not more than the circumstances reasonably indicate to be necessary. Homicide is justified by law when committed in defense of one's person against an unlawful and violent attack made in such manner as to produce a reasonable expectation or fear of death, or some serious bodily injury. Nor is a party bound to retreat before making such defense as the circumstances of the case may reasonably indicate to be necessary for his protection against the attack; and when such state of case exists, defendant will be entitled to be acquitted."

The motion for new trial raised the questions discussed in the opinion.

*Fisher & Townes,* for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

Hurt, Judge. Appellant appeals from a conviction of murder of the first degree, for the murder of James B. O'Bannon, the punishment being confinement in the penitentiary for life. We will discuss the errors in the order in which they are presented in the brief of appellant. The first, second and third assignments will be treated together, because they treat of the same matter.

The cause being regularly reached and called for trial, the State announced ready for trial, whereupon defendant filed and presented his motion for a change of venue upon the ground "that there existed in the county of Llano, where this prosecution is commenced, so great a prejudice against him that he cannot obtain a fair and impartial trial." This application was signed and sworn to by defendant, and was supported by the following affidavit:

"State of Texas, *County of Llano.*

"Now comes Wm. A. Yett, H. C. Oatman, T. J. Moore and J. R. Moss, credible citizens of Llano county, Texas, each of whom, being duly sworn, states on oath that the allegations in the above and foregoing application for change of venue, on the reverse hereof, are true.

      (Signed)                         "W. A. Yett,
                                         "H. C. Oatman,
                                         "T. J. Moore,
                                         "J. R. Moss."

To this application the following answer controverting the same was filed by the district attorney:

"And now comes the State by her attorney and denies all and singular the allegations in defendant's motion for a change of venue, and says that there is not so great a prejudice existing against the defendant C. C. Davis in Llano county as to prevent him from getting a fair and impartial trial in said county; and states affirmatively that he can get a fair and impartial trial in said county of Llano. And the district attorney states further that W. A. Yett, one of the affiants to the truth of defendant's motion, is a relative of defendant; that H. C. Oatman, another of the affiants to the truth of defendant's motion for change of venue, is a tenant of said W. A. Yett; that T. J. Moore and James Moss, the other two affiants to the truth of defendant's motion, are resident citizens of the southern portion of Llano county, and are not acquainted with the sentiment

of the jurors throughout the county of Llano, Texas. That there are over fourteen hundred legal jurors in Llano county, and that defendant can get a fair and impartial trial." This answer was supported by the affidavits of eight citizens of the county.

By article 578, Code Criminal Procedure, it is provided:

" A change of venue may be granted on the written application of the defendant, supported by his own affidavit and the affidavit of at least two credible persons, residents of the county where the prosecution is instituted, for either of the following causes, the truth and sufficiency of which the court shall determine:

" 1. That there exists in the county where the prosecution is commenced so great a prejudice against him that he cannot obtain a fair and impartial trial."

By article 583, Code Criminal Procedure, it is further provided: " The credibility of the persons making affidavit for change of venue, or their means of knowledge, may be attacked by the affidavit of a credible person, and the issue thus formed shall be tried and determined by the judge, and the application granted or refused, as the law and facts shall warrant."

To the answer controverting the application the defendant demurred: 1st. "Because it does not attack the credibility of either of the parties supporting said motion." 2d. "It does not attack the means of knowledge of said parties supporting said motion, and therefore is no answer to defendant's motion." The court overruled the demurrer, and defendant excepted and reserved his bill of exceptions.

The question presented for our determination is the sufficiency of the affidavit controverting the motion to change the venue of the case.

To the Code of Criminal Procedure, treating of the subject of change of venue, article 583 was added by an act passed February 21, 1879; and hence we can obtain no light bearing upon the question before us from adjudications prior to that date. This article had not been passed when the opinions were delivered in *Winkfield* v. *The State*, 41 Texas, 148; *Crow* v. *The State*, 41 Texas, 468; *Anschicks* v. *The State*, 45 Texas, 148, and *Grissom* v. *The State*, 4 Texas Ct. App., 374.

In *Winkfield* v. *The State*, Roberts, Chief Justice, holds that when the defendant makes application for a change of venue because of prejudice in the county against him, the prosecution can introduce in evidence counter-affidavits, showing that there is no such prejudice, as well as " affirmative " evidence of the fact of want of prej-

udice, and that in fact the defendant could have a fair and impartial trial.

In *Salinas* v. *Stillman*, 25 Texas, 16, it is held that counter-affidavits, or rebutting testimony, as to the grounds of an application for a change of venue are inadmissible.

In *Walker* v. *The State*, 42 Texas, 360, it was held that the application cannot be overturned by any number of counter-affidavits of a negative character; and in *Buford* v. *The State*, 43 Texas, 415, it is said: "nor by counter-affidavits which fail to show that the statements of the application are not true, even though accompanied with an unsworn statement of the prosecuting attorney."

And in *Anschicks* v. *The State*, 45 Texas, 148, it was held that the application cannot be overborne by such affidavits as do not attack the character of the compurgators for truthfulness or intelligence, nor show their want of information.

By comparing these opinions it will be found that the subject is left in doubt and uncertainty, especially with the trial judges. The above cases were all passed upon prior to the passage of article 583, and, as the law stood before this article was added, there was no provision made for the formation of a written issue between the defendant and the State. When the written application was made, properly supported by the affidavit of two "credible persons," without an affidavit controverting that of defendant, the application for the change could be contested by the State in the manner stated in the opinion of Chief Justice Roberts in *Winkfield* v. *The State*. But as this question had been left in uncertainty by the opinions in *Salinas* v. *Stillman*, *Walker* v. *The State*, *Buford* v. *The State* and *Anschicks* v. *The State*, the Legislature undertook to supply this matter by adding article 583.

Now let us examine article 583. The State has the right to controvert the application; but in what manner? How must this be done? The manner is plainly pointed out in this article. This must be done by the affidavit of some credible person that the general reputation of the supporting affiants is bad (see Willson's Crim. Forms, No. 639); or by the affidavit of some credible person that their means of knowledge are not sufficient to support and justify the statements contained in their said affidavits. (Willson's Cr. Forms, 640.) (While we do not intend to hold that Willson's Forms must be strictly followed, we, however, believe them to be admirable precedents, and that, if adopted, a great deal of trouble would be avoided.) The credibility or means of knowledge of the persons making the affidavit being thus attacked, an issue is formed between the defendant and the State. What is the issue or issues?

Defendant, the applicant for the change, affirms that there exists such prejudice in the county against him that he cannot obtain a fair and impartial trial. To this he makes an affidavit, which is supported by the affidavit of at least two credible persons. Now, if there be no affidavit of a credible person made controverting the affidavit of the defendant's supporting affidavits, the change must be granted, because there is no issue between the parties. But where the affidavit of some credible person is made controverting the credibility or the means of knowledge of the compurgators, an issue is formed; and, until this be done, there being no issue between the parties, there is nothing "to be tried and determined" by the judge. But when this is done, upon whom rests the burden of proof? We think upon the applicant — defendant. This, however, is a nice question. The affidavit controverting the defendant's supporting affidavit being made, "the issue thus formed shall be tried and determined by the judge, and the application granted or refused, as the law and facts shall warrant."

The judge must try and determine the issue formed in the manner directed in said article, and this shall be done as the law and facts shall warrant. What facts? Those adduced on the trial of the issue thus formed; and, by article 584, the facts adduced upon the trial of this issue must, to authorize this court to revise the order refusing a change of venue, be reserved in a bill of exceptions. If the credibility of the supporting affidavits is, by the proper affidavits, made the issue, the evidence must be confined to this issue; and so with regard to the means of knowledge, if that be the issue formed.

Just what facts are admissible under the last issue (that relating to the means of knowledge of the supporting affiants) presents an exceedingly difficult question. We believe that, under this issue, defendant would have the right to prove the existence of the prejudice by any witness, besides the affidavit of his compurgators; and, on the other hand, the State would have the right to prove that no such prejudice did in fact exist. The supporting affiants could thoroughly be tested, as to their means of knowledge, by either party.

We come now to consider the sufficiency of the affidavit controverting the affidavit made in support of defendant's motion for change of venue. Is it sufficient? Does it controvert the credibility of the compurgators? It does not; and hence there was no issue formed and no trial could be had upon this matter.

Does it controvert their means of knowledge? It states that Yett is a relative of defendant. Suppose he is; certainly he may

be a credible person.   Oatman is alleged to be a tenant of Yett. He, too, may nevertheless be a credible person.   It is alleged that Moore and Moss " were resident citizens of the southern portion of Llano county, and are not acquainted with the sentiment of the jurors throughout the county."   A person may reside in any portion of a county, and still have the very best means of knowing the sentiment of the people of the county in regard to certain matters. This affidavit does not *directly* deny the means of knowledge, and, if inferentially, the inference is quite vague and uncertain.   Strange, indeed, that this was not done in a clear and direct manner, leaving nothing to inference.

We are of the opinion that the affidavit is fatally defective, and that there was no issue formed to be tried and determined by the judge.   This being the case, the exceptions or demurrer to this affidavit should have been sustained.

But to the bill of exceptions to the order of the court overruling defendant's demurrer, the learned judge appends this explanation: "The parties whose affidavits were attached to the application for change of venue were all examined by the counsel for defendant and State, as well as five or six other witnesses; and, after full examination into the matters alleged in the application, and the means of knowledge of affiants thereto, it was overruled by the court."

Now, while the court may have erred in overruling the defendant's exceptions to the answer controverting the supporting affidavit, the defendant and the State, without any objections upon the part of defendant, went fully into this matter by examining the compurgators and a number of other witnesses, not only in regard to the existence of prejudice, but as to the means of knowledge of the supporting affiants.   Appellant might have objected to the introduction of any evidence until a legal issue was formed; but this was not done, and it does not appear that any incompetent evidence was received upon the trial of the issue, though not formed according to article 583.

We are not able to perceive in what manner the rights of appellant have been affected in this matter,— at least, not to such extent as would require a reversal of the judgment.

Fourth assignment:

It appears by bill of exceptions that, after the persons summoned as jurors had been sworn to answer questions as to their qualifications, the court called each juror separately and tested his qualifications by asking him the questions prescribed in article 631 of the Code of Criminal Procedure, and interrogating him as to all disqualifications and causes for challenge prescribed in article 636, ex-

cept challenges Nos. 3, 4 and 5; and when, after full examination by the court, it was found that no cause of challenge existed, each juror was passed to the State for challenge for cause, and, not being challenged by the State, was passed to defendant for challenge for cause, when the defendant by counsel claimed the right to (by his own counsel) interrogate each juror as to cause of challenge, for each cause which might exist. The court refused to permit this, stating that he would further examine such juror as to any particular cause for challenge which defendant might suggest, and for which he desired to challenge the juror, and permit defendant to produce evidence *aliunde* to show that any cause for challenge existed. To which ruling defendant objected and challenged each juror for cause generally, which was overruled by the court, and defendant again excepted.

It will be seen from the bill of exceptions that the court interrogated each juror as to all disqualifications and causes for challenge contained in article 636, except Nos. 3, 4 and 5, "and after a full examination it was found that no cause of challenge existed." Now it is not contended that the questions propounded by the court were not amply sufficient, and calculated thoroughly to test the competency of each juror. Nor does it appear that counsel for defendant desired to propound any question to the jurors, or either of them, which was refused by the court. The simple question presented is, whether the defendant had the right, by his counsel, to examine the jurors? We are of the opinion that, within proper limits, the safer practice would be to permit counsel to make the examination. But this matter is within the discretion of the court, and, if not abused, we will not reverse its action in the premises.

Under the thirteenth subdivision of article 636, if the juror answers that there is established in his mind such a conclusion as to the guilt or innocence of defendant as will influence him in his action in finding a verdict, he shall be discharged. But if he answers that such conclusion will not influence his action in finding a verdict, he shall be further examined by the court, or under its direction, as to how his conclusion was formed. Here we see that upon the most important matter relating to his competency, the court is expressly given the power to examine the juror. And if this examination is not sufficiently full and pertinent, certainly counsel for defendant would have the right to suggest questions calculated to elicit the real truth. We do not think that section 10 of the Bill of Rights has been impinged in this matter.

We are informed by bill of exceptions that, some time after the

homicide, defendant was confined in the Sherman jail on the charge of theft; that the witness Ligon, being informed by the authorities of Grayson county that they had a man in custody supposed to be Davis, went to Sherman to ascertain if said man was in fact Davis, and if so to bring him to Llano county to answer the charge of murder in this case. When Ligon reached Sherman he went to the jail and there had a conversation with defendant as follows: Ligon says, " I had a conversation with defendant in jail at Sherman. I pointed him out and called him C. C. Davis. He said his name was not Davis, that his name was Thomas Simpson." To which the defendant objected because at the time he was in custody; which objection was overruled, and these facts were admitted in evidence.

Defendant being in custody, whether upon this or any other charge, his confessions or statements were not admissible against him. (*Taylor* v. *The State*, 3 Texas Ct. App., 387; *O'Connel* v. *The State*, 10 Texas Ct. App., 367.)

Appellant denied his name and gave another as his true name, which was false. From this several inferences may be drawn; but that most unfavorable to defendant, that this was done to prevent identification and thus mislead Ligon, and by this means prevent him from taking him to Llano county to answer for the killing of O'Bannon. From this conduct the inference is that, as defendant denied his name, and falsely represented that he bore another name, therefore he was guilty of the murder of O'Bannon. While such a conclusion might be drawn from this conduct, it would certainly be strained, and very weak and flimsy. When viewed in the light of the other facts, this conduct of defendant, though suspicious, is very light and frivolous indeed, and we cannot believe that it had the slightest tendency to induce the jury to find the defendant guilty. And while this confession was not admissible, defendant being in arrest, still we do not think it at all probable that he was injured thereby, it being overwhelmingly proven by other evidence that he was the man who killed deceased.

Again: by the bill of exceptions it appears that defendant being in custody of O'Bannon upon a charge of misdemeanor, at the time and for a half hour previous to the homicide, he made certain statements and remarks to O'Bannon and others. Appellant objected to the introduction of these remarks because he was in arrest. These remarks were made prior to the homicide, and were not confessions. It would be a monstrous rule to hold that a prisoner could murder his keeper or the officer in charge of him, and because he was a prisoner his acts and declarations, before and at the time of the killing, could

not be adduced in evidence against him. To state the proposition demonstrates its unsoundness.

Eighteenth assignment:

Upon the subject of express malice the court charged the jury that "The deliberate shooting of another with cool, deliberate mind and formed design, if resulting in death, would be upon express malice." . . . Appellant objects to this charge because it omitted "unlawful;" for, it is urged, that a cool, deliberate killing with formed design is not of necessity murder of either degree; that, to make it so, the homicide must be unlawful; and in support of this proposition we are referred to the case of an officer executing a convict, coolly and deliberately, or, to a party who may exercise his right of self-defense in the same manner, without being guilty of any offense. These propositions may be true, but we must construe the charge as a whole, and if, when so construed, there be no error, it should be sustained.

Applying this rule to the charge on this subject, we believe it is correct. The jury were told in the first paragraph " That every person of sound memory and discretion, who shall *unlawfully* kill any reasonable creature in being, with malice aforethought, either express or implied, shall be deemed guilty of murder." Now it is altogether improbable that the omission of the word *unlawful* in that part of the charge relating to express malice induced, or was calculated in the slightest degree to induce, the jury to believe that they were authorized to convict, though the killing be lawful by reason of the right of self-defense.

We are of the opinion that, when viewed as a whole, there will be found no error in the charge because of this omission.

Defendant, by counsel, requested a charge on the law of self-defense, believing that given by the court defective, " because it hinges the necessity to kill upon the facts developed on the trial, and not as they appeared to defendant at the time." We have examined the charge of the court with reference to this objection, and are of the opinion that, under the facts of this case, it will be found correct. It is not, we think, obnoxious to the objections urged by appellant.

We have also closely examined all of the points raised in the record, though not insisted upon in the brief, and fail to discover such error as will require a reversal of the judgment. It is therefore affirmed.

*Affirmed.*

[Opinion delivered October 31, 1885.]