[No. 1964.]

## J. L. Wadlington v. The State.

1. Manslaughter —" Adequate Cause."— The four illustrations of " adequate cause" set out in article 497 of the Penal Code are not the only ones which will reduce a homicide from murder to manslaughter. On the contrary, it had been laid down as a correct rule that " any condition or circumstance which is capable of creating (and does create) sudden passion, such as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection, whether accompanied by bodily pain or not, is adequate cause."

2. Same.— It is positively declared by article 492 of the Penal Code that no verbal provocation will justify an assault and battery; and article 596 of the same Code is equally positive in the declaration that "insulting words or gestures, or an assault and battery so slight as to show no intention to inflict pain or injury, or an injury to property, unaccompanied by violence, are not adequate causes" sufficient to reduce a homicide from murder to manslaughter. But held that, though no one of these causes, alone and independent of the others, can be deemed adequate cause to reduce a homicide from murder to manslaughter, yet, if they all combine and exist conjointly with each other, they may, thus united, become such adequate cause. See the opinion in extenso on the question.

3. Same — Evidence — Charge of the Court — Case Stated.— In a trial for assault with intent to murder it was in proof that C., the alleged injured party, charged the defendant with improper relations with his, C.'s, wife, and that the defendant was claiming for himself the paternity of Mrs. C.'s child; which charges were emphatically denied by the defendant and were vehemently reasserted by C., who thereupon seized the defendant by his collar and shook him, when the defendant pushed C. off and patted him on the shoulder; that C. then ordered defendant to keep his hands off, and was still cursing defendant when defendant fired upon and shot C. through an arm. These facts being proved, the defendant proposed to disprove the charges made by C., and to show that his relations with the wife and child of C. had been and were entirely innocent and proper. This proof the trial court rejected as being too remote and irrelevant. Held, that, in view of the facts proved, the rejected evidence was competent and should have been admitted, and have been permitted to go to the jury in connection with a charge upon manslaughter to the effect that if, from the insults and assault, coupled together as adequate cause, they believed that the defendant committed the act under the immediate influence of sudden passion, such as anger, rage or sudden resentment sufficient to render his mind incapable of cool reflection, then they could find him guilty of no higher grade of offense than aggravated assault.

4. Same —" Cooling Time."— It is a rule of law applicable to this class of cases that, "however great the provocation may have been, if there be sufficient time for the passion to subside and for reason to interpose, the homicide will be murder. But if the wound was given by the prisoner while smarting under a provocation so recent and so strong that the prisoner might be considered as not being at the moment the master of his own understanding, the offense will be manslaughter." Under this rule, the proof in this case showing that, after C. was made to release his hold upon defendant, some two or three minutes elapsed before defendant fired, the court should have submitted to the jury the question of " cooling time," in connection with the charge upon manslaughter.

APPEAL from the District Court of Williamson. Tried below before the Hon. A. S. Walker.

The conviction in this case was for an assault with intent to murder one J. L. Contat, in Williamson county, Texas, on the 26th day of June, 1885. A term of two years in the penitentiary was the penalty assessed against the appellant.

A. Behrens was the first witness for the State. He testified that he knew the defendant and J. L. Contat. Witness and Contat were at work in the millet field of the witness's brother on the 26th day of June, 1885. The millet proving too wet to shock well, the witness proposed to Contat to abandon that work for the day, and go to another field near by, in which some oats were being harvested, and aid in that work. Contat agreed, and witness told him to go on, and that he would follow so soon as he had finished a shock he was then engaged on. In going to the oat field from the millet field it was necessary to cross a lane traversed by a public road, then a field, and then another road. When Contat reached the fence forming one side of the lane he encountered two men. They stopped and talked with Contat. Presently Contat called to witness: " Come here, Behrens; Jesse (meaning the defendant) is going to shoot me, and I want you as a witness." Witness did not go to Contat at once, but went on being called by Contat the second time. Witness could not hear anything said by the parties until he got near them. The defendant was then down on the ground, and had passed the reins of his horse's bridle to Jim Coe, the party who came to that point with him. Coe had not dismounted. The defendant's hand was in his pocket, the witness thought, for the purpose of bringing out something, the witness did not know what, when the witness reached the parties. Witness then told defendant not to shoot Contat; that Contat was not armed, and that it was not a manly act to shoot an unarmed man. Defendant and Contat cursed each other awhile, Contat accusing the defendant of taking his wife from him, and claiming his, Contat's, child as his, the defendant's, child. Contat told defendant that if he claimed that child as his he was a d—d liar. Defendant denied that he ever took or wanted Contat's wife, or claimed the child as his, and added that whoever had told such tales on him to Contat was a d—d liar. Contat and witness then crawled through the fence into the lane. Defendant made no attempt to stop them, or to hurt them. The quarrel was resumed as soon as witness and Contat got into the lane. Each party cursed and abused the other,

Contat charging the defendant with taking his wife and claiming paternity of the child, and defendant denying both charges. Contat then told defendant he could take the woman and go, but must leave the child. Defendant replied that he wanted neither the woman nor the child. This manner of dispute continued for some time, until finally, as the witness turned around to light his pipe, he heard the first shot fired. The ball passed through Contat's left arm. Witness turned rapidly and seized defendant's pistol hand, and defendant fired a second shot while Contat was dodging about. The last shot did not strike Contat's person, but grazed his back, making six holes in his shirt. Witness succeeded in disarming defendant, and Contat fled. Contat was in his shirt sleeves and was unarmed.

Cross-examined, the witness testified that in the struggle for the pistol, the defendant threw him down, and Contat ran off. Witness did not hear him say as he left: "Hold Jesse until I run and get a gun." The witness and Contat were not in waiting for or waylaying the defendant, but, as stated, went to that field to shock millet, but found the millet too wet to be worked. The witness never at any time heard Contat make any threats against the defendant. The defendant said that the child referred to in the quarrel was not his. Contat and defendant had been talking about five minutes when Contat called witness. Neither witness nor Contat expected to see defendant that day.

J. L. Contat was the next witness for the State. He testified that on Friday morning, June 26, 1885, the witness went with A. Behrens to Behrens's brother's field to work at shocking millet. After working a short time Behrens said that the millet was too wet to work, and directed witness to go to the oat field, beyond a lane and another field. Witness started, and as he got to the fence or near it, he saw the defendant and Jim Coe riding along the road. Witness called to the defendant to stop. Defendant did so, dismounted from his horse, and came to the fence, meeting witness: Witness said to him: "I hear that you claim my child." Defendant replied: "It is a d—d lie; I have never claimed it." Witness then said: "I hear that you are going to whip me." Defendant replied that that too was a d—d lie. Witness then told defendant to keep his, witness's, wife, but to leave the child. The defendant denied claiming or wanting either. Defendant then came towards witness with one of his hands in his pocket, motioning as though to draw something from his pocket. Witness then called to Behrens to come to them. Behrens came up and said to defendant:

"Don't shoot John; he has no pistol or knife." Behrens and witness then got through the fence into the lane. The defendant was then standing in the lane by the fence, with his hand still in his pocket. Defendant then renewed the dispute by saying: "I have heard that you have threatened to kill me." Witness denied that he had made any such threat, and told defendant that he did wrong to step between the witness and his wife, after he, witness, had done so much to help him along. After more talk of like nature witness took the defendant by the shirt collar with his right hand—the defendant still having his hand in his pocket. At this point Behrens interfered, and witness's attention was diverted to Coe, during which time the defendant got out his pistol and presented it at the witness's breast. Witness tried to strike the pistol away, but it was discharged, sending a ball through witness's left arm, inflicting a flesh wound but breaking no bones. The only demonstration the witness made during the difficulty was when the defendant patted him on the back. Witness then caught defendant's shirt collar, and the defendant fired as stated. Witness on being shot dodged behind Behrens, when the defendant fired again, sending a ball through the back of the witness's shirt, and making six holes in it. Witness then left, going to the nearest house, and did not return. Witness and Behrens both told the defendant that witness was unarmed. Witness told defendant that all he wanted was his child, and that he wished the defendant well.

Cross-examined, the witness testified that it was his belief that his wife was virtuous while she lived with him. She left him some five or six months prior to this trial. The child alluded to as being in part the subject-matter of the quarrel between witness and defendant was born before witness's wife left him. The witness did not start the report that his recreant wife and the defendant had married. Witness spoke of that report only when it was mentioned to him by others. Witness was convicted of an assault upon his wife during the summer of 1885. Witness had never uttered any threats against the defendant except that, when people would speak to him about defendant, witness would say: "I will be ready for him." It was not a fact that the witness had ever looked for the defendant, taking a "black-snake" whip with him. He had never inquired for the defendant about the places where his wife stayed, as the defendant was always at such places. It was not a fact that witness's wife went to McLaughlin's for protection. It was the belief of the witness that the defendant was living on McLaughlin's place, farming on "shares." The defendant did not, on the day of

the difficulty, stop until the witness called him. Defendant, Jim Coe and Frank McLaughlin were witnesses for the State in the case against witness for assault on his wife, but none of the State's witnesses in that case testified on the trial, except witness's wife. Witness was fined in the sum of $150, and was now working that fine out with Behrens. Witness thought that his wife was virtuous up to the time she left him. Witness had often spoken of his wife when spoken to about her by other persons. At this point the State closed.

James Coe testified, for the defense, that he and defendant went from McLaughlin's place in Williamson county, to the town of Georgetown, on the 26th day of June, 1885. When they were passing through the lane at Colonel Coffee's farm, they were hailed by Contat, who was working in Behrens's field, some seventy or seventy-five yards from the lane. He called: "Hold on; I want to see you." Defendant and witness halted, and Contat came up to the fence on the inside of the field, and spoke to the defendant, saying: "I hear you have been telling lies on me, and I want you to quit, you d—d son-of-a-b—h." Defendant dismounted and walked up to the fence, putting his hands in his pockets. Contat called to Behrens: "Come here, Andrew, quick." Behrens came and Contat said to him: "Here, I want you to see defendant has a pistol." Contat then got over the fence and seized defendant's shirt collar, and shook the defendant violently. Defendant pushed Contat off, telling him to desist. Contat then told defendant not to put his hands on him, and cursed defendant, when defendant shot Contat through the arm. Before the shooting Contat said to defendant: "I hear that you claim my child." Defendant replied that it was a lie; that he had never claimed the child. The witness had never heard Contat utter any threat against defendant. When Contat caught and shook the defendant he acted as though he intended to strike the defendant. Contat uttered the first insulting words. Witness's wife was Contat's cousin. Defendant was so nearly blind that he could not distinguish one man from another at any considerable distance.

Cross-examined, the witness testified that he could not remember that the defendant used either profane or insulting language during the difficulty with Contat. He told Contat that if any one had told him that he, defendant, claimed Contat's wife or child, such person told a lie. After Contat caught and shook the defendant, the defendant patted him, Contat, on the breast and shoulder, and Contat told him to keep his hands off him. Defendant replied that he

would put his hands on him whenever he pleased. They stopped their violence about three minutes before defendant shot, though Contat continued to curse the defendant. Contat was unarmed and made no demonstrations that witness saw, at the time the pistol was fired.

Frank McLaughlin testified, for the defense, that Mrs. Contat was a first cousin of his. She lived with her mother on the witness's place. On the third Sunday in June, 1885, the witness heard Contat say that " before the defendant should carry his (Contat's) baby around, he (Contat) would kill him, if he had to lay in the penitentiary the balance of his life for it." Contat's reputation was that of a violent man. Witness communicated his threat to defendant on the day after its utterance.

Cross-examined, the witness stated that the reputation of Contat was not that of a desperado, but of a disturber. Witness had never heard of his being engaged in a fight. He was a great talker, and once told witness of his having knocked a man down with a broom. During the time of her residence with Contat, Mrs. Contat was a virtuous woman.

N. T. Turner testified, for the defense, that he told defendant to look out for Contat, as he thought he might hurt him. Cross-examined, the witness said that he had never heard Contat threaten defendant, but he knew that there was much bad feeling between defendant and Contat. Defendant told witness, in reply, that he would be ready for Contat. Witness did not know Contat to be a dangerous man. On his re-examination, the witness said that on one occasion Contat, having a " black-snake " whip in his hand, came to witness, and asked if he had seen a speckled cow. He also asked for the defendant, and witness thought he was hunting defendant. He said that he wanted to talk to defendant.

B. H. Burnham testified, for the defense, that the defendant's reputation was that of a quiet, peaceable man. Witness had never heard anything said against the characters of either defendant or Contat prior to this difficulty. Defendant was a larger man than Contat, but his eyes were bad. Hurk, Patrick and Tom Turner, witnesses for the defense, testified substantially as did Burnham.

Mrs. M. A. Contat testified, for the defense, that she was the wife of the prosecuting witness, John L. Contat. Her relations with the defendant were those merely of friendly acquaintance. Nothing of a criminal or improper nature had ever transpired between defendant and witness. The defendant had never made improper proposals to the witness, nor troubled her in any way unbecoming a gentleman.

Forney Hoyle testified, for the defense, that a short time before the shooting of Contat by defendant, he had Contat in custody for unlawfully carrying a pistol. During that time Contat told witness that he was going to "make it hot" for defendant. Witness advised defendant to be on his guard against Contat. Contat's remark was that defendant was at the bottom of all his family troubles, and that he intended to make it hot for him.

Thomas Cochran, county attorney of Williamson county, testified, for the defense, that J. L. Contat informed him that defendant had married his, Contat's, wife; that the records of the county showed the issuance of license to them. Witness ascertained that the ceremony under the license of record was performed by the Reverend Mr. Hurd of San Saba county. Witness had process issued for Hurd, who informed witness that the license issued to entirely different persons; the lady's name being Mrs. Contat's maiden name, and that of the groom, except the middle initial, being the same as defendant's. Witness subsequently spoke to Contat about the matter, and Contat said that, upon reflection, he remembered that he and his wife were together on the date of the marriage under the said license.

The motion for new trial raised the questions discussed in the opinion.

*Makemson & Price* and *Fisher & Townes*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

White, Presiding Judge. Two of the State's witnesses who were present and knew and heard what transpired at the time of the difficulty, one of them being the injured party himself, testified that Contat charged defendant with improper relations with his, Contat's, wife, and also that defendant was claiming to be the father of her child. Both charges were emphatically denied by defendant, but were vehemently reasserted by Contat, who then took defendant by the collar of his shirt and shook him. Defendant pushed him off, and patted him on the breast and shoulder. Contat told him to keep his hands off, and was still cursing him when defendant shot, his ball hitting him in the arm. All this testimony was properly admitted as part of the *res gestæ*. The cause of the difficulty appears to have been the charges made by Contat against defendant with regard to defendant's relations to his wife and her child. After this evidence had been elicited, defendant proposed to disprove the

charges which Contat had thus made against him, and to show that his relations to the wife and child had been and were entirely innocent and proper. This the court refused to permit him to do, holding the evidence to be too remote and irrelevant.

We are of opinion that the importance of this ruling becomes apparent when considered in connection with the charge of the court as given. The court simply charged the law of assault with intent to murder and aggravated assault. A charge was asked by the defendant upon manslaughter as applicable to the facts, which the court refused to give, as shown by the bill of exceptions. Without the evidence above alluded to the charge given was perhaps sufficient; with it, in our opinion, a charge upon manslaughter would have been essentially requisite to its sufficiency. Was the evidence admissible? Did it tend to elucidate and explain the act and conduct of the defendant in the transaction; if so, then it was admissible.

Defendant is charged with illicit intimacy with a man's wife and the further fact that he claims the paternity of her child, by her own husband; yet he is most conscious of his innocence. He is equally as conscious of the woman's innocence. He knows that the husband has abused and maltreated the wife until she has been compelled to abandon her home and seek protection elsewhere. He finds himself now for the first time confronted with and charged by the irate husband as the cause of these troubles, and in connection with the charge is violently seized by the shirt and roughly handled. All these things, taken together, would naturally tend to outrage the feelings and arouse the mind in a man of ordinary temper to anger, rage and sudden resentment, rendering it incapable of cool reflection.

It is true that no verbal provocation justifies an assault and battery (Penal Code, art. 492), and true that it is also declared by statute that "insulting words or gestures, or an assault and battery so slight as to show no intention to inflict pain or injury, or an injury to property, unaccompanied by violence, are not *adequate causes*" sufficient to reduce a homicide from murder to manslaughter under our Code. (Penal Code, art. 596.) Any one of these facts alone and of itself will not be sufficient. Our statute provides us with four illustrations of adequate causes. (Penal Code, art. 497.) These four statutory illustrations, however, are not the only causes which will reduce murder to manslaughter; they are simply explanatory and not restrictive. (*Brown* v. *The State*, 38 Texas, 482; *Johnson* v. *The State*, 43 Texas, 612; *West* v. *The State*, 2 Texas

Ct. App., 460; *Guffee* v. *The State*, 8 Texas Ct. App., 187.) As was said in *Williams* v. *The State*, 15 Texas Ct. App., 617: "Nor is bodily pain absolutely essential to adequate cause in manslaughter. It is true that an assault and battery causing pain and bloodshed is an adequate cause, made so by statute. (Penal Code, art. 597.) But adequate cause is not limited to the illustrations enumerated in the Code. Any condition or circumstance which is capable of creating (and does create) sudden passion, such as anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection, whether accompanied by bodily pain or not, is adequate cause." (Penal Code, art. 594; *Neyland* v. *The State*, 13 Texas Ct. App., 536.) The adequate cause is not estimated by pain but by *sudden passion*. (See, also, *Hobbs* v. *The State*, 16 Texas Ct. App., 517.)

Now, in the case before us, suppose we admit that the insulting words and charges of Contat were alone insufficient,— suppose we admit that his assault upon defendant was so slight as to show no intention to inflict pain or injury, and consequently that by and of itself it was also insufficient; but, on the other hand, suppose we find them, as in this case, not isolated from one another but united together, does our statute anywhere declare that when the insufficient parts are thus united together they shall not together and as a whole constitute adequate cause? We know of no such declaration. Mr. Wharton says: "At the same time it must be remembered that an assault too slight in itself to be a sufficient provocation may become such by being coupled with insulting words." (Whart. on Homicide, § 393.) As to whether the two, when coupled together, are sufficient to constitute "adequate cause," that is, whether they were sufficient to produce, and did produce, in the mind of defendant such a degree of anger, rage, sudden resentment or terror as to render it incapable of cool reflection, is a question of fact for the jury to determine under proper instructions from the court. (*Williams* v. *The State*, 7 Texas Ct. App., 396.)

Appellant's conscious innocence would tend to magnify the wrong and intensify the insult done him by the charges made against him by Contat. Inasmuch as the prosecution had drawn out the charges and the insults,— and if not controverted they were certainly calculated to prejudice his case,— we are of opinion he should have been allowed to introduce his testimony, both to disprove these charges and to throw light upon his motives and conduct throughout the transaction. It was error, under the peculiar circumstances of this case, as above stated, to refuse him the benefit of this evidence.

As presented in the evidence which was adduced, we think, for the reasons already stated, defendant should have had a charge on the law of manslaughter, with instructions that if from the insults and assault coupled together as adequate cause, they believed that defendant committed the act under the immediate influence of sudden passion, such as anger, rage, or sudden resentment, sufficient to render his mind incapable of cool reflection, then they could find him guilty of no higher grade of offense than aggravated assault.

This would have given him the benefit of aggravated assault in two of its phases; whereas the court's charge only gave him the benefit of one, viz., aggravated assault committed by means of a deadly weapon. The charge of the court upon this latter phase was admirably and comprehensively expressed as follows: " If the jury find from the testimony that the defendant, at the time and place as alleged, did unlawfully shoot at and shoot the said J. L. Contat, and there is no evidence or insufficient evidence of malice and intent to take the life of said Contat, and if they find that said defendant inflicted serious bodily harm, if the pistol as used or attempted to be used was a deadly weapon, then the jury will find defendant guilty of an aggravated assault," etc.

In connection with a charge upon manslaughter, inasmuch as the evidence showed that after Contat was made to loose his hold of defendant's shirt collar, some two or three minutes elapsed before defendant shot, the question "of cooling time" would have been proper to have been submitted. ( *Winkfield* v. *The State,* 41 Texas, 151; *Eanes* v. *The State,* 10 Texas Ct. App., 422.) For the rule is that "however great the provocation may have been, if there be sufficient time for the passion to subside and for reason to interpose, the homicide will be murder." . . . But, " if the jury are of opinion that the wound was given by the prisoner while smarting under a provocation so recent and so strong that the prisoner might be considered as not being at the moment the master of his own understanding, the offense will be manslaughter." (Whart. on Homicide, §§ 488, 489.)

Several other supposed errors are assigned and are ably presented in the brief of appellant's counsel, but the ones we have discussed are the only ones deemed important and material.

Because the court erred in refusing to permit defendant to introduce the excluded evidence above mentioned, and because the court erred in refusing to charge the law of manslaughter as applicable to the facts in the case, the judgment is reversed and the cause remanded for a new trial.          *Reversed and remanded.*

[Opinion delivered November 4, 1885.]